**COMMONWEALTH OF PENNSYLVANIA, Appellant,**

v.

**Miriam T. WHITE, Appellee.**

Superior Court of Pennsylvania.

Argued Feb. 12, 2002.
Filed Feb. 25, 2003.

Hugh Burns, Jr., Assistant District Attorney, Philadelphia, for Commonwealth.

Bradley S. Bridge, Philadelphia, for appellee.

Before FORD ELLIOTT, JOYCE and BECK, JJ.

OPINION BY BECK, J.:

¶ 1 In this case we consider whether the Commonwealth may appeal, as of right, a pretrial order denying recusal. We also consider the Commonwealth's right to appeal an adverse ruling on its request for a

jury trial. We hold that the Commonwealth may not appeal the denial of recusal as of right, but is entitled to an appeal in the event the trial court refuses its request for a jury trial.

## FACTS

¶ 2 This case involves a homicide committed by an eleven-year-old girl, appellee Miriam White. The Commonwealth alleges and Ms. White appears to concede that on the afternoon of August 20, 1999, she stabbed fifty-five year old Rose Marie Knight in the chest, causing her death. By operation of law, Ms. White was charged as an adult for the crime of murder. 42 Pa.C.S.A. § 6355(e). Legal proceedings concerning the proper manner in which to punish, treat, restrain and rehabilitate Ms. White have been ongoing for nearly three years.

¶ 3 In a series of pretrial hearings before the Honorable Renee Cardwell Hughes, defense counsel and the Commonwealth attempted to reach a plea agreement, but the effort was unsuccessful. Thereafter, defense counsel moved to decertify the case to juvenile court and the matter came before the Honorable Legrome D. Davis. Again, attempts at plea negotiations commenced, but again they proved unsuccessful. After extensive analysis and a thorough assessment of the case, Judge Davis denied decertification in November 2000 and the matter returned to Judge Hughes's courtroom.

¶ 4 Defense counsel informed Judge Hughes that Ms. White intended to plead guilty to murder generally and requested that the court schedule a degree of guilt hearing. The prosecutor then inquired whether the judge believed that the degree of guilt hearing could result in a verdict of less than third degree murder, i.e., voluntary manslaughter. The court responded in the affirmative. One week later, the prosecutor appeared before Judge Hughes and asked that she recuse herself and assign the matter to another judge. Judge Hughes denied the request. The prosecutor then requested that the Commonwealth be afforded its right to a jury trial. Judge Hughes denied the request. Finally, the prosecutor asked the court to certify for appeal both the recusal issue and the request for a jury trial. Judge Hughes denied the request. The Commonwealth then filed this appeal.[1]

## APPEALABILITY OF THE RECUSAL ISSUE

¶ 5 The threshold question in this case is whether the orders for which the Commonwealth seeks review are appealable. We begin with the denial of recusal. The Rules of Appellate Procedure permit pretrial Commonwealth appeals in the event the prosecution is terminated or substantially handicapped:

> In a criminal case, under the circumstances provided by law, the Commonwealth may take an appeal as of right from an order that does not end the entire case where the Commonwealth certifies in the notice of appeal that the

---

1. When the trial court refused to certify the matter for interlocutory appeal, the Commonwealth filed a Petition for Review under Pa. R.A.P. 1511, which was docketed at 108 EDM 2000, as well as an appeal as of right under Pa.R.A.P. 311(d) (the instant action), which was docketed at 3282 EDA 2000. This court denied the Petition for Review on January 21, 2001. However, the panel refused to quash the appeal as of right and permitted it to continue without prejudice to appellee's right to request quashal before the merits panel. As a result, we have before us the Commonwealth's appeal as of right under Rule 311(d) Defendant/Appellee once more seeks to quash the appeal, arguing that it is not appealable under Rule 311(d).

order will terminate or substantially handicap the prosecution.

Pa.R.A.P. 311(d).

¶ 6 There exists a sizeable body of case law discussing the Commonwealth's right under Rule 311(d) to file pretrial appeals. The most familiar cases are those addressing the admission or exclusion of evidence. Rule 311(d) has been held applicable to an order of suppression, *Commonwealth v. Dugger*, 506 Pa. 537, 486 A.2d 382 (1985); an order granting a defendant's motion in *limine* to exclude certain evidence, *Commonwealth v. King*, 456 Pa.Super. 72, 689 A.2d 918 (1997); and an order granting a defendant's motion in *limine* to admit certain evidence, *Commonwealth v. Allburn*, 721 A.2d 363 (Pa.Super.1998), *appeal denied*, 559 Pa. 662, 739 A.2d 163 (1999).

¶ 7 But in the past decade, we have deemed several non-evidentiary pretrial orders to be appealable as of right by the Commonwealth. For instance, the Commonwealth may appeal an order precluding it from seeking the death penalty, *Commonwealth v. Buonopane*, 410 Pa.Super. 215, 599 A.2d 681 (1991), *appeal denied*, 530 Pa. 651, 608 A.2d 27 (1992); an order transferring a case from criminal to juvenile court, *Commonwealth v. Johnson*, 542 Pa. 568, 669 A.2d 315 (1995); and an order denying a Commonwealth request for a continuance in order to secure a witness, *Commonwealth v. Matis*, 551 Pa. 220, 710 A.2d 12 (1998). In each of these cases, the appellate court determined that the nature of the order made an appeal as of right proper.

¶ 8 The Commonwealth argues that its certification alone establishes its right of appeal and an appellate court may not inquire into the reasons upon which it relies to assert a substantial handicap under Rule 311(d). It is true that in cases regarding the admission or exclusion of evidence, we have not inquired into the appropriateness of the Commonwealth's claim of substantial handicap and explicitly have held that the Commonwealth's certification is determinative of its right to appeal. *See, e.g., Dugger, supra; Allburn, supra; Commonwealth v. Pitts*, 740 A.2d 726 (Pa.Super.1999).[2] This treatment of evidentiary issues is logical; the judiciary does not intrude upon evidentiary assessments made by the district attorney in the cases she chooses to bring to court. But the fact that we decline to probe evidentiary issues in this context does not mean that the district attorney alone decides what is and what is not appealable under Rule 311(d).

¶ 9 Prior case law establishes that the courts have placed and continue to place limits on the Commonwealth when it invokes the Rule. In *Commonwealth v. Smith*, 518 Pa. 524, 544 A.2d 943 (1988) (plurality), our Supreme Court held that an order for severance did not constitute one that substantially handicapped the prosecution because the Commonwealth still was permitted to seek convictions on the charges it filed, *albeit* in two separate proceedings rather than one, *Id.* at 527–28, 544 A.2d at 945. Just this year, a panel of this court did not accept blindly the Commonwealth's certification of substantial handicap. In *Commonwealth v. Shearer*, 2002 WL 398798 (Pa.Super.2002), the panel's majority held that a pretrial order directing that a child witness be examined by a psychologist could not be appealed

**2.** In the non-evidentiary cases that we have treated as appeals as of right, we either did not address the application of Rule 311(d), *see, e.g., Buonopane, supra* (imposition of the death penalty) and *Johnson supra* (transfer to juvenile court) or we analogized the order on appeal to one addressing evidentiary issues. *See Matis, supra* (continuance in order to secure a witness).

under Rule 311(d) because the order did not affect the Commonwealth's ability to pursue the charges against the accused. The *Shearer* majority observed:

> [D]espite the Commonwealth's certification, ... the order [will not] in and of itself hamper, much less terminate, prosecution of the case. Only if the child is ultimately ruled incompetent by the trial court, with or without the assistance of a psychologist's prior expert opinion, will the Commonwealth be obstructed in its actions.

*Id.* at *2.

¶ 10 Although *Shearer* has since been withdrawn so that the Superior Court may consider the case *en banc*,[3] its rationale is compelling and its conclusion, along with that of the plurality in *Smith*, suggests that when issues other than those evidentiary in nature are raised, we may pause to consider the propriety of the Commonwealth's certification.[4] No doubt this is due in part to a concern that invocation of Rule 311(d) not become the norm, but rather remain an exception to be utilized only where necessary.

▮ ¶ 11 With that precise concern in mind, and based on Rule 311(d) case law generally, we find that notwithstanding the Commonwealth's certification, we are authorized to consider whether an order denying recusal is appealable. Further, our consideration of the issue leads us to conclude that such order falls short of establishing a substantial handicap.

¶ 12 The ability of the Commonwealth to present its case has not been affected by the court's order denying recusal. Not only are there no adverse evidentiary rulings facing the Commonwealth, but, unlike in *Johnson*, the charges remain intact. Unlike in *Buonopane*, the possible punishment has not been altered. And unlike in *Matis*, the availability of witnesses is not compromised. Further, to expand the Rule would be to disturb the orderly process of litigation. Strict application of the Rule assures that trials will go forward as scheduled. We decline to expand Rule 311(d) to include an appeal from an order denying recusal.[5] We find that such an order is beyond the scope of Rule 311(d) and, therefore, is not appealable as of right.

## MERITS OF THE RECUSAL ISSUE

¶ 13 Although we find that the court's recusal order is not appealable, we address its merits in response to the dissent's consideration of the issue. The dissent be-

---

**3.** The *Shearer* majority, Justice Montemuro and Judge Musmanno, inquired into the validity of the Commonwealth's claim that it was substantially handicapped by the trial court's order. Distinguishing clear evidentiary rulings of a trial judge, such as an order admitting or excluding certain evidence, the majority concluded that an appeal under Rule 311(d) was unwarranted under the facts. *Shearer*, slip op., at *2 n. 2. In dissent, Judge Olszewski stated that the Commonwealth's certification of substantial handicap was sufficient to allow an appeal under Rule 311(d) since there was no evidence that the certification was made in bad faith. *Id.* at *2 (Olszewski, J., dissenting).

What the *en banc* panel will decide on this issue is uncertain. However, the case law to date has not required an assessment of bad faith when considering a Commonwealth appeal under Rule 311(d). We decline to engage in one here.

**4.** The *Smith* plurality explicitly distinguished appeals based on an evidentiary ruling from those rendered in other cases, such as the severance order before it.

**5.** Our holding does not preclude the Commonwealth from ever appealing a denial of recusal pretrial. As the Commonwealth itself recognized in this case, the proper manner for raising such a claim is via a Petition for Review under Pa.R.A.P. 1511. While such Petition was unsuccessful here, its availability to the Commonwealth remains.

lieves that recusal was proper in this case, but we do not agree that bias or prejudice is established by the record nor do we believe that an appearance of bias or prejudice is evident.

¶ 14 The Commonwealth devotes a substantial portion of its brief to comments Judge Hughes made to Ms. White prior to the decertification proceedings, while plea negotiations were ongoing. Those comments included questions about Ms. White's diet, food preferences and other factors concerning her condition and treatment while awaiting trial. The Commonwealth argues that the court's "fulsome praise" of and "solicitous concern" for Ms. White combined to "create an appearance of improper personal involvement." Appellant's Brief at 32. We disagree.

¶ 15 The exchanges between Judge Hughes and Ms. White were proper when viewed in context. The court had before it a twelve-year-old girl, whom all parties conceded was severely troubled. It appeared at that time that a negotiated resolution would be reached. Judge Hughes, in questioning and reassuring Ms. White, attempted to put the child at ease, to reassure the child and to put a human face on the judicial system, which surely was mystifying and frightening to the twelve-year-old. The court's interaction with the child, while admittedly uncommon, was not inappropriate considering the uncommon facts before the court, particularly the child's age and her troubled mental state.

¶ 16 The Commonwealth also refers us to other comments made by the court once decertification was denied and it became clear that a negotiated resolution would not be reached. Among them is the judge's statement that she would not be "forced to treat this [case] like a regular case" and believed "the law [placing Ms. White in criminal court instead of juvenile court] was wrong." Obvious from those comments and others is the fact that the judge was disappointed with the turn of events, particularly because the case involved such novel—and tragic—circumstances.

¶ 17 These comments revealed the court's frustration in having to deal with this unique case in a standard manner, as well as her exasperation with the fact that the matter was not proceeding smoothly. The judge candidly admitted that she did not want to treat this case as a garden-variety juvenile matter that had been denied decertification. But her disclosure was tempered with her statements that she had no intention of placing either party at a disadvantage and had every intention of upholding the law. After reviewing all of the comments of which the Commonwealth complains, we would not find that Judge Hughes pre-judged the case. Nor would we find that her remarks established that she was unwilling to follow the law or even appeared so.

¶ 18 Thus, even if we could address the recusal issue, we would not find for the Commonwealth on the merits.

## APPEALABILITY OF THE JURY TRIAL ISSUE

¶ 19 The Commonwealth also challenges the trial judge's order denying it a jury trial. We find without question that the Commonwealth may appeal this order as of right under Rule 311(d). The Commonwealth's asserted right is constitutional in its basis: "[I]n criminal cases the Commonwealth shall have the same right to trial by jury as does the accused." Pa. Const. art I, § 6 (amended 1998). The amendment has been upheld by the Pennsylvania Supreme Court and so is valid. *Commonwealth v. Tharp*, 562 Pa. 231, 754 A.2d 1251 (2000). Precluding the Commonwealth from appellate review on this issue would permit the trial court to over-

ride a constitutional provision based on its own interpretation of that provision. After trial, the constitutional issue would never reach an appellate court.[6]

¶ 20 A trial court's denial of the Commonwealth's constitutional right to a jury trial no doubt constitutes a substantial handicap under Rule 311(d), much the same way a court's order decertifying a juvenile case or precluding the death penalty does. *See Commonwealth v. Johnson,* 542 Pa. 568, 669 A.2d 315 (1995) (decertification); *Commonwealth v. Buonopane,* 410 Pa.Super. 215, 599 A.2d 681 (1991), *appeal denied,* 530 Pa. 651, 608 A.2d 27 (1992) (death penalty).

¶ 21 It is the genesis of the Commonwealth's asserted right to a jury trial, our state Constitution, that requires the order be appealable as of right.

## MERITS OF THE JURY TRIAL ISSUE

■ ¶ 22 In determining that a degree of guilt hearing could go forward and the Commonwealth's request for a jury trial was precluded, the trial court erroneously relied on the Pennsylvania Rules of Criminal Procedure.[7] The Rules provide that in a non-capital case, a defendant may plead guilty to murder generally and in such cases, "the judge before whom the plea was entered shall alone determine the degree of guilt." Pa.R.Crim.P. 590(c). This procedural rule affords a criminal defendant the option of having the trial judge, rather than a jury, determine her degree of guilt. But implementation of the Rule is irrelevant in the event that the Commonwealth seeks to exercise its constitutional right to a jury trial.

■ ¶ 23 The Commonwealth's right, as set out in the Constitution, is reciprocal. It attaches in all instances in which the criminal defendant has the right to a jury trial. Its effect, simply, is to permit the Commonwealth to insist on a jury trial despite a criminal defendant's decision to waive that same right. It is clear that the Commonwealth's exercise of its right to a jury trial in this case was intended to preclude the trial judge from sitting as fact finder and determining the degree of guilt. The Constitution, as amended, entitles the Commonwealth to do just that. As a result, and based on the rationale set forth *infra,* we hold that the Commonwealth

---

**6.** In the event of an acquittal, the Commonwealth would have no right of appeal because it is precluded from challenging a not guilty verdict. In the event of a conviction, the Commonwealth would have no right of appeal because it would not be an aggrieved party.

**7.** In a related claim, the Commonwealth also asserts that Ms. White is not entitled to a degree of guilt hearing in any event, because the only charge pending against her is third degree murder. According to the Commonwealth, if Ms. White wishes to plead guilty, she must enter a plea to third degree murder. In support of its claim, the Commonwealth refers us to case law that precludes a trial judge from instructing a jury on voluntary manslaughter where there is no evidence to support the charge. These cases are not controlling as they address jury instructions following a murder trial whereas this case presents an initial charge of murder generally, followed by the Commonwealth's statement that it would not proceed with first degree murder charges.

Our Supreme Court clearly has stated that a guilty plea to murder generally can result in first, second or third degree murder, as well as voluntary manslaughter, as long as there is evidence presented by the accused to support it. *See Commonwealth v. Myers,* 481 Pa. 217, 392 A.2d 685 (1978). *See also Commonwealth v. Bickley,* 448 Pa. 319, 292 A.2d 317 (1972); *Commonwealth v. Swaney,* 445 Pa. 244, 284 A.2d 732 (1971). Although this issue is likely irrelevant in light of our decision on the Commonwealth's right to a jury trial, it is nonetheless the law that where a degree of guilt hearing goes forward, the possibility of a voluntary manslaughter conviction goes with it. *Id.*

may demand a jury trial in the face of the defendant's request to plead guilty to murder generally.

¶ 24 A plea of guilty to murder generally is a unique plea, unlike anything else provided in statute or decisional law. It appears to be like a guilty plea because the defendant concedes at least some level of guilt. But the option of proceeding under Rule 590(c) is *not* the same as a defendant pleading guilty to the charges filed against her. In a guilty plea, no evidence is presented against the defendant. The judge in her colloquy merely assures that the defendant is aware of the facts underlying the plea. A Rule 590(c) proceeding, on the other hand still requires the presentation of evidence, the arguments of counsel and the finding of facts in support of a verdict. As a practical matter, the procedure set out in Rule 590(c) is akin to a bench or waiver trial. The criminal defendant first waives her right to be tried by a jury.[8] Thereafter, evidence is presented against her by the district attorney and her counsel advocates on her behalf via testimony, argument or both. At the end of this proceeding, a verdict is rendered by the court. The Rule in essence provides for a form of a waiver trial for the defendant facing murder charges. Under the newly adopted constitutional provision, the Commonwealth can oppose this procedure and demand that the matter be resolved by a jury trial.

¶ 25 It is for the reasons set out above that we disagree with the trial court that the Commonwealth's exercise of its right to demand a jury trial denies an accused the right to plead guilty. We reiterate that the distinctive nature of murder charges sets them apart from others. In most instances, a criminal defendant's decision to plead guilty would be met with approval by the district attorney and the notion that the district attorney could or would oppose such a plea appears absurd.[9] Murder is the only crime wherein we permit a guilty plea to a general charge and allow, at least in non-capital cases, that the degree of guilt be determined by the judge. *See* Pa.R.Crim.P. 590(c). This option, created by rule and available only to murder defendants, is not a simple guilty plea. It is instead a variation of a waiver trial and as such, it cannot trump the Commonwealth's constitutional right to demand a jury trial. Where the Commonwealth seeks to assert its right to a jury trial, a criminal defendant facing murder charges simply may not invoke Rule 590(c).

¶ 26 The constitutional provision giving the Commonwealth a reciprocal right to a jury trial certainly permits the Commonwealth to insist that a jury, and not the court, render the verdict in a criminal case. *Tharp, supra; Commonwealth v. Puksar,* 559 Pa. 358, 740 A.2d 219 (1999), *cert. denied,* 531 U.S. 829, 121 S.Ct. 79, 148 L.Ed.2d 42 (2000).

¶ 27 Based on the applicable law, the trial judge erred in concluding that the Commonwealth had no right to a jury trial. The court's reliance on a procedural rule to oppose a clear constitutional right was misplaced. The trial court's order must be reversed and the Commonwealth permitted to exercise its constitutional right to a jury trial.

---

8. The Comment to the Rule directs that the trial judge elicit from the defendant her recognition of this fact.

9. A defendant's decision to admit guilt for rape when charged with rape, or to plead guilty to aggravated assault when charged with aggravated assault, would not prompt a challenge from the district attorney.

## CONCLUSION

¶ 28 In light of our analysis, we conclude that the Commonwealth's appeal of the order denying recusal must be quashed because the order is not appealable under Rule 311(d). We further conclude that the order of the trial court denying the Commonwealth's request for a jury trial is appealable. Under the rationale stated above we reverse the order of the trial court and direct that the Commonwealth be permitted to exercise its constitutional right to a jury trial.

¶ 29 Order quashed in part and reversed in part; matter remanded for further proceedings consistent with this Opinion.

¶ 30 Jurisdiction relinquished.

¶ 31 JOYCE, J. files a Dissenting Opinion.

## DISSENTING OPINION BY JOYCE, J.

¶ 1 I agree with my esteemed colleague's disposition of the issues regarding the trial court's denial of the Commonwealth's right to a jury trial and the ability of the judge to find manslaughter following a guilty plea to murder generally. However, I write to separate myself from the Majority's consideration of the recusal issue.

¶ 2 By itself, I agree with the Majority's conclusion that the recusal issue is interlocutory under Pa.R.A.P. 311(d). However, the recusal issue was only one of three issues the Commonwealth raised on appeal, which were all part and parcel of the same series of events. In fact, only one order disposes of all three issues. See Certified Record, Docket Entry D–9, Order dated 1/1/2001. If each issue is to meet the requisites set forth in case law

and Pa.R.A.P. 311(d), why did the Majority also consider the issue regarding a court's ability to find manslaughter following a degree of guilt hearing? The order pertaining to this issue also would be interlocutory, yet it was considered in the Majority's opinion. In my view, to avoid piecemeal litigation and to resolve the conflict from which this appeal arose, I would consider each of the issues raised herein.[10] Hence, I will turn to the merits of the Commonwealth's recusal issue.

¶ 3 The standard for recusal in Pennsylvania is well settled.

> It is the burden of the party requesting recusal to produce evidence establishing bias, prejudice or unfairness which raises a substantial doubt as to the jurist's ability to preside impartially. As a general rule, a motion for recusal is initially directed to the jurist whose impartiality is being challenged. In considering a recusal request, the jurist must first make a conscientious determination of his or her ability to assess the case in an impartial manner, free of personal bias or interest in the outcome. The jurist must then consider whether his or her continued involvement in the case creates an appearance of impropriety and/or would tend to undermine public confidence in the judiciary. This is a personal and unreviewable decision that only the jurist can make. Where a jurist rules that he or she can hear and dispose of a case fairly and without prejudice, that decision will not be overturned on appeal but for an abuse of discretion. In reviewing a denial of a disqualification motion, we recognize that our judges are honorable, fair and competent.

*Commonwealth v. Abu–Jamal,* 553 Pa. 485, 720 A.2d 79 (1998) (internal citations

---

10. The temporal relationship between the issues is of primary importance. Simply because one issue is appealable does not open the door to raise all other issues.

omitted). "Because the integrity of the judiciary is compromised by the appearance of impropriety, recusal is necessary where the judge's behavior *appears* to be biased or prejudicial. Accordingly, even if the court determined that there is no actual prejudice, the court must recuse itself if it appears that there is any improper influence." *Commonwealth v. Benchoff,* 700 A.2d 1289, 1295 (Pa.Super.1997) (citations omitted)(emphasis in original). "The impartiality of the court, which is a fundamental prerequisite of a fair trial, must be deemed compromised by appearance alone, thus eliminating the need for establishing actual prejudice." *In the Interest of McFall,* 533 Pa. 24, 617 A.2d 707 (1992).

¶ 4 The Commonwealth cites to various portions of the record to support its contention that the trial court demonstrated an appearance of impropriety. First, the Commonwealth contends that the trial court's expression of anger towards it is evidence of bias and the appearance of impropriety. Specifically, the Commonwealth refers to the following statement:

> To say I am angry is just—doesn't even begin to equate to you the level of hostility that I feel right now; because number one, I thought it was clear to everyone in this room that I do not think the traditional judicial system is prepared to accommodate the case that is in front of us, and that it required the acknowledgment that Miriam White was; A, not necessarily appropriate to be in the community; and B, it required us to not necessarily think like DA[']s and defense lawyers and to look for a resolution that was not only in the community's best interests but in this child's best interests.

N.T., Status Hearing, 12/02/99, at 5. In addressing the Commonwealth's concern, some history is required to put the comment into context. The trial court was faced with a nearly unprecedented situation where an eleven-year-old girl fatally stabbed a total stranger. Based upon a report of Appellee's mental heath professional, the trial court was operating under the belief that Appellee was decompensating in adult prison. N.T., Bail Hearing, 11/19/99, at 7, 27. As a result of this information and the trial court's impression that all the parties wanted to resolve the case with a nontraditional disposition, there was a lengthy discussion about the need to have Appellee's mental health evaluated and who the appropriate party was to conduct the evaluation. *Id.* at 34. The hope was that this evaluation would assist the parties and the court in finding a more appropriate facility in which to house Appellee which was secure enough to protect the community while still addressing her needs. The parties all seemed to agree on this course of action. It appears, however, that the Commonwealth drafted a letter to the agreed upon mental heath professional on the same day as the status hearing. The record indicates the trial court's belief that the letter resulted in Appellee not being evaluated as planned. N.T., Status Hearing, 12/02/99, at 4–5. The trial court then expressed her anger at this development, borne out of frustration and what the court perceived as deceit by the Commonwealth to undermine its efforts at facilitating a disposition of the case.

¶ 5 Later, during the same status hearing, the trial court met with Appellee. Upon Appellee entering the courtroom, the trial court introduced itself, showed Appellee the stenographer's machine and explained that her responses needed to be verbal. It was explained that nothing was going to happen that day and that the trial court just wanted to meet her. Appellee was advised that a doctor was going to see her and the trial court elicited a promise that she would cooperate so that the trial

court could send her to the "right place" that would be "good for [her]" and where she can grow. *Id.* at 22–23. The trial court told Appellee how "absolutely beautiful" she is, that she has a "gorgeous smile," and that the court wanted "to send [her] to a place where [she] can grow up to be a beautiful young woman." *Id.* at 23. The trial court then engaged Appellee in the following dialogue:

THE COURT: Is everything going all right?

[APPELLEE]: Kind of.

THE COURT: Are you eating?

[APPELLEE]: Yes. I eat a lot.

THE COURT: You eat a lot. Okay. Good food?

APPELLEE: Yes. A lot of bad food.

THE COURT: Really. Food's not very good?

APPELLEE: Uh-uh.

THE COURT: Do they give you any fruit?

[APPELLEE]: Yes, I eat that too.

THE COURT: Good, good, good. What do they give you that you don't like?

[APPELLEE]: I don't like the vegetables.

THE COURT: The—oh, the vegetables. But vegetables are good for you. What do they do, cook them too long?

[APPELLEE]: It tastes like they not all cooked done.

THE COURT: Oh, you know why. Crunchy vegetables are better for you. When you cook them until they get mushy, then they're no good. Yeah, crunchy vegetables are better for you, you know. Do they have anything you like?

[APPELLEE]: Yes. I just like peanut butter and jelly, raw carrots, and I like hamburgers.

THE COURT: I like raw carrots too. I eat them every day for lunch. Honest to goodness. Every day for lunch I eat raw carrots. And what else?

[APPELLEE]: I like hamburgers, hot dogs, chicken.

THE COURT: Me too. I like hamburgers, hot dogs and chicken. You know, my son's favorite thing in life.

[APPELLEE]: I like pizza too.

THE COURT: What kind?

[APPELLEE]: I like sausage.

THE COURT: You like sausage. See, I like mushrooms.

[APPELLEE]: I like mushrooms too.

THE COURT: Yeah, mushroom is good stuff. It's good stuff. I have to see if I can get you some pizza.

[APPELLEE]: Okay.

THE COURT: I don't know. I can't promise.

[APPELLEE]: I know.

THE COURT: But I can call and see if they can get you a pizza every now and again. . . .

N.T., Status Hearing, 12/02/99, at 24–26. In conclusion, the trial court told Appellee it was "glad to meet [her]" and that it would "work very hard on getting [her] in a good place" but that Appellee had to cooperate and be good. The trial court then shook Appellee's hand and stated it was "so pleased to meet" her. *Id.* at 27–28.

¶ 6 The Commonwealth argues "[t]his conversation between the lower court and a defendant who concededly stabbed an innocent pedestrian to death is disturbing. The court's fulsome praise of the defendant; its exclamations of pleasure; its solicitous concern; and condonation of defendant's characterization of murdering [the victim] as a mistake; create an appearance of improper personal involvement." Commonwealth's Brief, at 32.

¶ 7 Although I disagree with the Commonwealth's characterization of this conversation, I do agree that this type of dialogue is rarely seen between a court and a defendant. It is unquestionable that the subject matter is peculiar in the courtroom setting, although it appears that the trial court was attempting to gauge Appellee's mental stability and chose a level of conversation appropriate for a twelve-year-old in order to do so. The trial court's intention to assess Appellee's mental health in a casual manner is evidenced by its comment "Miriam seems okay, you know. At least she presented well for the five minutes that I was able to interact with her, ...." *Id.* at 66. However, in doing so the trial court managed to share personal information about itself and its family. Worse yet, the trial court told Appellee that it would attempt to get her pizza while she was incarcerated, which would certainly constitute special treatment as I doubt that the trial court often attempted to obtain pizza for other alleged murderers who await trial. Whether or not the trial court's conduct during the 12/02/99 status hearing amounts to an appearance of impropriety is a very close question. However, the Commonwealth asks that other portions of the record be reviewed to further support the appearance of impropriety.

¶ 8 The Commonwealth next cites to the trial court's statement that it would not be "forced to treat this like a normal case" to support the existence of an appearance of impropriety. Certainly, Appellee's case was far from normal and to that end the trial court attempted to persuade the Commonwealth and the defense to work together to reach a disposition that would protect the community while addressing the best interests of Appellee. However, when it became evident that the parties could not approach Appellee's case amicably, the trial court stated:

I have always fully appreciated both of your need to, if you have to go to trial, not to have disadvantaged one another by your desire to cooperate at this point in time, but I have got to have something. Even if I subpoena the records and hold them in camera for me, and I am permitted to do that, but I have got to have—I need something now because now what you're leaving me with if we can't get past this hurdle, and this is a significant hurdle in my mind, if we can't get past this hurdle, what you are leaving me with is to treat this case like any other case in the system. And I don't care who knows this from [Chief] Justice Flaherty all the way down. This system is not equipped to deal with this case, and I don't want to treat it this way. And unless I am ordered to by higher-ups, I am not going to, and I am still not going to disadvantage either one of you. And so I may have to do some things that are unusual. I don't want to be boxed into treating this like a regular case. It's not appropriate. It's not appropriate. And at this point in time nobody can force me to do this unless y'all come in here with an order from [Chief Justice] Flaherty. You can't force me to treat this like a regular case.

*Id.* at 41–42.

¶ 9 I am greatly concerned with the trial court's statements. While I can appreciate the fact that no one enjoys seeing a twelve-year-old child standing in adult criminal court charged with murder, the fact remains that the law does provide for this type of situation. 42 Pa.C.S.A. § 6322 states:

**Transfer from criminal proceedings**

**(a) General rule.**—... If it appears to the court in a criminal proceeding charging murder or any of the offenses excluded by paragraph (2)(ii) or (iii) of the

definition of "delinquent act" in section 6302, that the defendant is a child, the case may similarly be transferred and the provisions of this chapter applied. In determining whether to transfer a case charging murder or any of the offenses excluded from the definition of "delinquent act" in section 6302, the child shall be required to establish by a preponderance of the evidence that the transfer will serve the public interest. In determining whether the child has so established that the transfer will serve the public interest, the court shall consider the factors contained in section 6355(a)(4)(iii) (relating to transfer to criminal proceedings).

42 Pa.C.S.A. § 6355(e), entitled "**Transfer to criminal proceedings**" provides: "(e)**Murder and other excluded acts.**— Where the petition alleges conduct which if proven would constitute murder, ... the court shall require the offense to be prosecuted under the criminal law and procedures, except where the case has been transferred pursuant to section 6322 (relating to transfer from criminal proceedings) from the division or a judge of the court assigned to conduct criminal proceedings."

¶ 10 Thus, the legislature has determined that certain crimes, when committed by children, are so heinous that the perpetrators are to be treated as adults. Murder, the most heinous crime, falls squarely into this category, as it is specifically enumerated. However, the legislature also created an exception that would allow the case to be transferred from criminal to juvenile court if the child proved by a preponderance of the evidence that the public interest would be served by transferring the case. This is the law and this is the manner in which the trial court was required to proceed with Appellee's case. Contrary to the trial court's belief that "this system is not equipped to deal with this case" the legislature has already made a determination as to how this type of case is to be handled. The trial court's pronouncement that it was not going to be "boxed into treating this like a normal case" unless it was "ordered to by higher-ups" indicates that the trial court prejudged the case and was unwilling to follow the law as set forth by the legislature, and as it is required to do.

¶ 11 Ultimately, Appellee's case did proceed in the fashion proscribed by §§ 6322 and 6355 in that the defense moved to transfer the case from criminal court. However, the decertification court, which was different than the trial court, denied the motion. Following the decertification hearing, Appellee's case was again presided over by the trial court. Because of the trial court's prior declarations regarding how it believed the case should be handled, the Commonwealth expressed concern about the trial court's ability to be impartial. In response, the trial court candidly admitted. "I think the law is wrong. However, I think any fair examination of my record reveals that I absolutely uphold the law in all instances. Miriam White will be tried as an adult. That decision has been made by a court over which I have no review authority."[11]  N.T., Status Hearing, 11/17/00, at 3.

¶ 12 The Commonwealth also cites to the trial court's response to its motion to recuse as further evidence of its inability to be impartial. "Adverse rulings alone do not, however, establish the requisite bias warranting recusal, especially where the rulings are legally proper." *Abu–Jamal, supra*, 720 A.2d at 90. An oral motion was

---

**11.** The trial court's reference to a court over which it has no authority is the trial judge who conducted Appellee's decertification hearing.

made where the trial court was asked to recuse itself during the 11/17/00 status hearing. N.T. 11/17/00, at 2. The motion was again argued to the trial court on November 20, 2000. In response to the motion the trial court referred to the Commonwealth as "arrogant" and found the motion to be "patently offensive". N.T., Status Hearing, 11/17/00, at 16. A review of the record makes obvious the trial court's displeasure with the Commonwealth's motion.

¶ 13 The vehement reaction of the trial court to a motion that is reasonably meritorious is the proverbial final nail in the coffin, in my opinion, when examining this case. While the examples I have reviewed, standing alone, may not warrant the conclusion that there exists an appearance of impropriety, I would find that in the aggregate, such a determination is compelling. While I can appreciate the efforts of the trial court in attempting to reach a resolution favorable to all the parties involved, in doing so the overall effect was to create an appearance of impropriety. Thus, in my view, the trial court should have recused itself from Appellee's case. Accordingly, I would reverse on this issue as well.