910 A.2d 648

**COMMONWEALTH of Pennsylvania, Appellant/Cross–Appellee**

v.

**Miriam T. WHITE, Appellee/Cross–Appellant.**

Supreme Court of Pennsylvania.

Argued Oct. 18, 2004.

Decided Nov. 22, 2006.

646

Bradley Steven Bridge, Karl Baker, Defender Ass'n of Philadelphia, for Miriam T. White.

Hugh J. Burns, Jr., Philadelphia Dist. Attorney's Office, for the Com. of PA.

Before: CAPPY, C.J., CASTILLE, NIGRO, NEWMAN, SAYLOR, EAKIN and BAER, JJ.

## *OPINION*

Justice EAKIN.

**Mr. Justice Eakin announces the Judgment of the Court. Mr. Justice Eakin delivers the Opinion of the Court with respect to parts II, III, and IV.B, in which Mr. Justice Castille, Madame Justice Newman and Mr. Justice Saylor join, and a plurality opinion with respect to parts I and IV.A, in which Mr. Justice Castille and Madame Justice Newman join.**

This appeal presents two issues: (1) whether an interlocutory appeal as of right, pursuant to Pa.R.A.P. 311(d), lies from a trial court's denial of a motion for recusal; and (2) whether the Commonwealth has a right under the Pennsylvania Constitution to have a jury determine the degree of guilt after a defendant pleads guilty to murder generally. The Superior Court concluded it did not have jurisdiction under Pa.R.A.P. 311(d) to review the recusal motion, and that the Common-

wealth has a right to a jury at a degree of guilt hearing. *Commonwealth v. White*, 818 A.2d 555 (Pa.Super.2003). We reverse in part and affirm in part.

The Philadelphia police arrested 11–year–old Mariam[1] White in conjunction with the stabbing death of Rose Marie Knight. By operation of law, White was charged as an adult for the crime of murder. *See* 42 Pa.C.S. § 6355(e). There were several failed attempts at negotiating a plea before the Honorable Renee Cardwell Hughes of the Philadelphia Court of Common Pleas. Subsequently, White's counsel moved to decertify the case to juvenile court. The decertification proceedings occurred before the Honorable Legrome D. Davis. Before the decertification motion was decided, several more attempts at negotiating a plea were made, but no agreement was reached. Ultimately, Judge Davis denied decertification, and the case returned to Judge Hughes. *See* N.T. Decertification Hearing, 11/2/00, at 38.

Defense counsel told Judge Hughes that White intended to plead guilty to murder generally and requested that the court schedule a degree of guilt hearing. N.T. Status Hearing, 11/8/00, at 4. The prosecutor inquired whether the judge believed a degree of guilt hearing could result in a verdict of less than third degree murder, *i.e.*, voluntary manslaughter. *Id.*, at 8–9. Judge Hughes responded in the affirmative. *Id.* at 9. One week later, the prosecutor appeared before Judge Hughes and asked that she recuse herself. N.T. Status Hearing, 11/17/00, at 2. The prosecutor asserted that while plea negotiations were ongoing prior to the decertification proceedings, Judge Hughes made statements which showed judicial bias. *Id.*, at 4. Judge Hughes denied the request for recusal. The prosecutor also requested that the Commonwealth be afforded its right to a jury trial. *Id.*, at 10. Judge Hughes denied the request. Finally, the prosecutor asked that the court certify both questions for immediate appeal

---

1. White's first name appears in the record as both "Miriam" and "Mariam"; however, a document bearing White's signature reflects the spelling as "Mariam."

under 42 Pa.C.S. § 702(b).[2] *Id.,* at 11–12. Again, the judge denied the request. The Commonwealth appealed the judge's rulings.

On appeal, the Superior Court quashed in part and reversed in part. *White,* at 563. The court first addressed the availability of an immediate appeal from an order denying a recusal motion under Pa.R.A.P. 311(d), which allows the Commonwealth to appeal, as of right, an interlocutory order that "terminates or substantially handicaps" the prosecution. *White,* at 558. The court reasoned it need not "accept blindly" the Commonwealth's certification of substantial handicap. *Id.* Rather, "when issues other than those evidentiary in nature are raised, we may pause to consider the propriety of the Commonwealth's certification." *Id.,* at 559. The court considered the fact that the ruling did not interfere with the Commonwealth's ability to present its case, and ultimately declined to expand Rule 311(d) to include an appeal from an order denying recusal. *White,* at 559. The court also considered whether the jury trial issue was appealable under Rule 311(d), and concluded that precluding the Commonwealth from appellate review of this issue would allow a trial court to overrule a constitutional provision based on its own interpretation, which "no doubt" constituted a substantial handicap under Rule 311(d). *White,* at 560–61.

In considering whether the Commonwealth has a right to a jury at a degree of guilt hearing, the Superior Court first noted the procedural rule governing such hearings "affords a criminal defendant the option of having the trial judge, rather than a jury, determine her degree of guilt." *Id.,* at 561. The court then noted that "implementation of the Rule is irrelevant in the event that the Commonwealth seeks to exercise its constitutional right to a jury trial." *Id.* The Commonwealth's right to a jury trial is "the same as" the defendant's, as

---

**2.** This section governs interlocutory appeals by permission and allows the court to certify an issue for appeal when it is "of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the matter." 42 Pa.C.S. § 702(b).

provided for by Article 1, § 6 of the Pennsylvania Constitution. "Its effect, simply, is to permit the Commonwealth to insist on a jury trial despite a criminal defendant's decision to waive that same right." *White*, at 561. The Superior Court concluded a guilty plea to murder generally is unique, and what follows is akin to a trial, since the proceedings still involve the presentation of evidence, the arguments of counsel, and the findings of fact in support of the verdict. *Id.*, at 562. Accordingly, the court concluded a degree of guilt hearing was "a variation of a waiver trial and as such, it cannot trump the Commonwealth's constitutional right to demand a jury trial." *Id.*

This Court granted allowance of appeal on the question of "whether the Commonwealth is permitted to appeal an order denying recusal of a trial judge as an interlocutory order pursuant to Pa.R.A.P. 311(d), and if so, whether denial of the recusal motion was in error." *Commonwealth v. White*, 577 Pa. 316, 845 A.2d 199, 200 (2004). We also granted allowance of appeal to address whether the Commonwealth has a right to a jury at a degree of guilt hearing when a defendant pleads guilty to murder generally.[3]

## I. Commonwealth's Right to Appeal Denial of Recusal Under Pa.R.A.P. 311(d)

We turn first to the question of the Commonwealth's right to appeal under Rule 311(d) when a trial court denies a recusal motion. It is well settled that, as a general rule, appellate courts have jurisdiction only over final orders. *See* 42 Pa.C.S. § 742 (providing appellate jurisdiction to Superior Court over "final orders"); *id.*, § 762 (same for Commonwealth Court); *Commonwealth v. Wells*, 553 Pa. 424, 719 A.2d 729 (1998). That general rule, however, is subject to exceptions which give appellate courts jurisdiction to review interlocutory orders under limited circumstances. *See* 42 Pa.C.S. § 702 (governing appellate jurisdiction over interlocutory or-

---

**3.** The two issues presented for review are purely questions of law. Accordingly, our standard of review is *de novo*, and our scope of review is plenary. *Buffalo Twp. v. Jones*, 571 Pa. 637, 813 A.2d 659 (2002).

ders); *see also* Pa.R.A.P. 311 (interlocutory appeals as of right); Pa.R.A.P. 312 (interlocutory appeals by permission). Rule 311(d) provides such an exception in criminal cases when an order terminates or substantially handicaps the prosecutor's case:

In a criminal case, under the circumstances provided by law, the Commonwealth may take an appeal as of right from an order that does not end the entire case where the Commonwealth certifies in the notice of appeal that the order will terminate or substantially handicap the prosecution.

Pa.R.A.P. 311(d).

The Commonwealth asserts the text of Rule 311(d) does not bar review of recusal rulings. Further, a plain reading of the text, coupled with this Court's prior case law, leads to the conclusion that the Commonwealth must be allowed to appeal from pre-trial rulings that implicate "the particular burden which it bears to prove its case." Commonwealth's Brief, at 33 (quoting *Commonwealth v. Cosnek*, 575 Pa. 411, 836 A.2d 871, 877 (2003)). According to the Commonwealth, an order denying recusal implicates this precise burden, because a biased court can hamper the presentation of the prosecutor's case.

White responds that the Commonwealth's contentions are at odds with *Cosnek*, which she argues specifically limited the scope of Rule 311(d) to appeals from "pretrial ruling[s] result[ing] in the suppression, preclusion or exclusion of Commonwealth evidence." White's Brief, at 15 (quoting *Cosnek*, at 877).

As both parties argue *Cosnek* controls the outcome of this issue, we begin our analysis with that case. In *Cosnek*, we considered whether the Commonwealth had the right to appeal an order which ruled on the admissibility of defense evidence. *Cosnek*, at 871. We first considered the "legal underpinnings" of Rule 311(d), noting the government may bring an interlocutory appeal in criminal cases only under express statutory authority. *Cosnek*, at 873. We then examined the origin of Rule 311(d), explaining the language of the

Rule was derived from *Commonwealth v. Bosurgi*, 411 Pa. 56, 190 A.2d 304 (1963), in which this Court devised a strategy for evaluating cases after *Mapp v. Ohio*, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961). *Cosnek*, at 874. In *Mapp*, the United States Supreme Court concluded that evidence seized in violation of the Fourth Amendment was inadmissible in state proceedings.[4] *Cosnek*, at 874. Thus, *Bosurgi* held that when a pre-trial order of suppression will terminate or handicap the prosecution, the order has such an "attribute of finality" as to give the Commonwealth the right of immediate appeal. *Cosnek*, at 874. In *Cosnek*, we further explained that subsequent case law clarified *Bosurgi*, such that the Commonwealth merely needed to allege an order suppressing, precluding, or excluding evidence terminated or substantially handicapped its case to be entitled to a pre-trial appeal under Rule 311(d). *Cosnek*, at 874 (citing *Commonwealth v. Dugger*, 506 Pa. 537, 486 A.2d 382, 386 (1985)).

Following this review of Rule 311(d), we concluded the Commonwealth did not have a right to an interlocutory appeal from an order admitting defense evidence under Rule 311(d). We noted the origin of the Rule was to ensure the Commonwealth could meet the specific burdens of proof of the case and the focus of the Rule was the suppression, preclusion, or exclusion of *Commonwealth* evidence. *Cosnek*, at 877. For these reasons, we held the application of Rule 311(d) was limited to a pre-trial ruling that results in the "suppression, preclusion or exclusion of Commonwealth evidence...." *Cosnek*, at 877.

The instant case, however, does not involve an order "suppressing, precluding, or excluding" Commonwealth evidence; thus, the parties dispute the relevance of *Cosnek*. White argues *Cosnek* expressly limited the application of Rule 311(d) to the Commonwealth's right to appeal an interlocutory order in the suppression of evidence context. The Commonwealth

---

**4.** "In the wake of *Mapp*, new impetus has been given to the practice of filing by defendants of motions to suppress evidence seized in allegedly illegal searches. In this Commonwealth, such motions, save in exceptional circumstances, are *now required* to be made *in advance of trial*." *Bosurgi*, at 308 (emphasis in original).

encourages a much broader reading of *Cosnek*, which would include all cases where the Commonwealth alleges the order "terminates" or "substantially handicaps" its case.

Rule 341 of the Rules of Appellate Procedure defines a "final order" as an order disposing of all claims and all parties, any order expressly defined as a final order by statute, or any order entered pursuant to subsection (c) of the Rule. Pa. R.A.P. 341(b). The Comment to Rule 341 explains that, following the 1992 amendments to the Rule, in the criminal context "[o]rders formerly appealable under Rule 341 by the Commonwealth in criminal cases as heretofore provided by law, but which do not dispose of the entire case, are now appealable as interlocutory appeals as of right under Subdivision (d) of Rule 311." Comment, Pa.R.A.P. 341. Thus, criminal orders which had been appealable under Rule 341 were to be encompassed within Rule 311(d).

■ *Cosnek* sought to apply Rule 311(d) to the Commonwealth's appeal of an *in limine* ruling which denied its motion to exclude defense evidence; it did not involve an order remotely similar to that at issue here. The limited question in *Cosnek* was the proper application of Rule 311(d) in light of the specific challenge forwarded; we were not asked to revisit and rewrite Rule 311(d), nor to deal with circumstances not there presented. Rules and cases serve differing functions and have differing effects. Rules certainly build upon and reflect experience, but they primarily seek to frame future expectations and attempt to provide general guidance. Cases, on the other hand, are narrow and necessarily fact-bound. Thus, *Cosnek's* language that "we limit the application of Rule 311(d) to those 'circumstances provided by law' in which a pretrial ruling results in the suppression, preclusion or exclusion of Commonwealth evidence," *Cosnek*, at 877, should not be read as undoing Rule 311(d), which simply provides the Commonwealth may appeal an order, not just certain types of orders, which terminates or substantially handicaps the prosecution. *See Cosnek*, at 882 (Eakin, J., dissenting); *accord Commonwealth v. Shearer*, 584 Pa. 134, 882 A.2d 462, 471–72 (2005) (Newman, J., concurring); *id.*, at 472–74 (Saylor, J.,

concurring); *id.*, at 474–75 (Eakin, J., concurring and dissenting). This is the plain language of the Rule, and to the extent *Cosnek* may be understood differently, it is hereby overruled. Accordingly, when an order terminates or has the practical effect of terminating some or all of the Commonwealth's case, or substantially handicaps the Commonwealth's case, and the Commonwealth has certified the same in good faith, the Commonwealth is entitled to an interlocutory appeal as of right under Rule 311(d).

Here, the Commonwealth has certified in good faith that denial of its recusal motion will substantially handicap its prosecution of this case. *See* Notice of Appeal, 11/21/00. Indeed, if the judge is unable to preside and serve as factfinder impartially, and an unfair verdict is rendered, the Commonwealth, unlike a criminal defendant in a similar circumstance, has no appellate recourse. Thus, "if there is a good faith certificate that a pretrial ruling substantially hampers the case of the party whose one job is to seek justice, and the only possible time to appeal is before jeopardy attaches at trial, the appeal should be allowed." *Cosnek*, at 884 (Eakin, J., dissenting). Accordingly, we proceed to review the merits of the recusal issue under Rule 311(d).[5]

## II. Merits of Recusal Issue

The Commonwealth sought recusal of Judge Hughes based on her interaction with White, expressions of her personal feelings about the accused and the case, and opinions about the justice system's ability to handle the case. The judge believed White, a juvenile, was not suited for adult prison, and that the parties agreed that the matter should proceed with a nontraditional disposition, *i.e.*, with White

5. Ordinarily, we would remand for the Superior Court to address the merits of this issue in the first instance, since quashal of an appeal does not involve ruling on the merits; however, in this instance, the Superior Court's majority opinion addressed the merits of the recusal issue in response to the dissent's consideration of the issue. The majority concluded the issue was meritless, whereas the dissent would have reversed, requiring that White's degree of guilt hearing be held before a different judge. *Cf. White*, at 559–60 and *id.*, at 563–68 (Joyce, J., dissenting).

being evaluated by a mental health professional in order to determine a more appropriate facility in which to house her. However, when the parties were convened before the court at a status hearing, it came to the judge's attention that the Commonwealth drafted a letter to the mental health evaluator, which the judge believed resulted in White not being evaluated as originally discussed. *See* N.T. Status Hearing, 12/2/99, at 3–10. The judge stated:

> To say I am angry is just—doesn't even begin to equate to you the level of hostility that I feel right now; because number one, I thought it was clear to everyone in this room that I do not think the traditional judicial system is prepared to accommodate the case that is in front of us. . . .

> Our best effort, our best avenue of making something happen has been foreclosed and I am convinced is because of this letter. . . . [S]o I don't know when I'm going to get her out of adult prison to get an assessment. I am angry.

*Id.*, at 5–6.

Because White had been told she would meet the judge that day, she was brought before the court, even though there was to be no formal evaluation at that time. The judge engaged her in conversation, during which she told White she was "absolutely beautiful," had a "gorgeous smile," and that she wanted "to send [her] to someplace where [she] could grow up to be a beautiful young woman." *Id.*, at 23. The judge inquired if White was eating, asked her about her favorite foods, admitted to liking some of the same foods and commented that her son also liked those foods, and said she would try to "see if they can get you a pizza every now and then." *Id.*, at 24–26. Before White left the courtroom, the judge told her she was "glad to meet [her]" and that she was "going to work very hard on getting [her] into a good place," but White had to "be good." *Id.*, at 27. The judge then shook White's hand and said, "Oh, wonderful. I am so pleased to meet you." *Id.*, at 28. When White responded affirmatively that she would "work with" the judge, the judge responded, "Excellent. Good girl." *Id.*

When it became evident there would be no expert evaluation of White at the status hearing as originally planned, thus leaving the trial court with nothing upon which to assess White and proceed with a non-trial disposition of the case, the judge stated:

> I have got to have something. Even if I subpoena the records and hold them in camera for me, and I am permitted to do that, but I have got to have—I need something now because . . . if we can't get past this hurdle and this is a significant hurdle in my mind, if we can't get past this hurdle, what you are leaving me with is to treat this case like any other case in the system. And I don't care who knows this from Justice Flaherty all the way down. This system is not equipped to deal with this case, and I don't want to treat it this way. And unless I am ordered to by higher-ups, I am not going to, and I am still not going to disadvantage either one of you. And so I may have to do some things that are unusual. I don't want to be boxed into treating this like a regular case. It's not appropriate. It's not appropriate. And at this point in time nobody can force me to do this unless y'all come in here with an order from Flaherty. You can't force me to treat this like a regular case. So I want the med[ical records] in camera.

*Id.*, at 41–42.

At a subsequent status hearing held after a different trial judge refused to decertify White's case from criminal to juvenile court, the Commonwealth orally requested that Judge Hughes recuse herself because "there [was] the appearance of prejudgment by [the judge] in [the] matter." N.T. Status Hearing, 11/17/00, at 2. The judge responded:

> I don't think that there is any basis for your request for recusal. Let's be absolutely clear. I do not think that a seven year old should be tried as an adult, and that is what this child has the intellectual capacity of. She is biologically 13 years old. I make no bones about that. I have been very clear publicly and in private. I think this law is wrong. However, I think any fair examination of my record reveals that I absolutely uphold the law in all instances. Mariam

White was tried as an adult. That decision has been made by a court over which I have no review authority. I have been advised by the defense that she seeks a degree of guilt, period. The protocol in this jurisdiction is that section leaders retain the degree of guilt, period. It stays in my room.... I will not recuse myself. There is no legal basis for recusal.

*Id.*, at 2–3. The judge further emphasized that she had not prejudged the case, and there was nothing on the record that said she would do anything other than follow the law. *Id.*, at 4. After refusing to certify the issue for appeal under 42 Pa.C.S. § 702(b) and accepting the Commonwealth's written recusal motion for review, the judge commented, "I know what was presented to me and what has not been presented to me, and the arrogance of you to come in here and presume that I would somehow not honor my obligations as a jurist is patently offensive." N.T. Status Hearing, 11/17/00, at 15–16. When the Commonwealth tried to make one more request, the judge replied, "I don't want any more requests from you because you have prejudged me and it is inappropriate. It is absolutely inappropriate and it is baseless." *Id.*, at 17.

The standard for recusal is well-settled:

It is the burden of the party requesting recusal to produce evidence establishing bias, prejudice or unfairness which raises a substantial doubt as to the jurist's ability to preside impartially. As a general rule, a motion for recusal is initially directed to and decided by the jurist whose impartiality is being challenged. In considering a recusal request, the jurist must first make a conscientious determination of his or her ability to assess the case in an impartial manner.... The jurist must then consider whether his or her continued involvement in the case creates an appearance of impropriety and/or would tend to undermine public confidence in the judiciary. This is a personal and unreviewable decision that only the jurist can make. Where a jurist rules that he or she can hear and dispose of a case fairly and without prejudice, that decision will not be overturned on appeal but for an abuse of discretion.

*Commonwealth v. Abu–Jamal,* 553 Pa. 485, 720 A.2d 79, 89 (1998) (citations omitted). Furthermore, "[a]ny tribunal permitted to try cases and controversies must not only be unbiased but must avoid even the appearance of bias." *In the Interest of McFall,* 533 Pa. 24, 617 A.2d 707, 713 (1992). "There is no need to find actual prejudice, but rather, the appearance of prejudice is sufficient to warrant the grant of new proceedings." *Id.,* at 714.

The dissenting opinion filed in the Superior Court in this matter is well-reasoned and persuasive. In analyzing the exchange between the judge and White, the dissent noted:

> [T]his type of dialogue is rarely seen between a court and a defendant. It is unquestionable that the subject matter is peculiar in the courtroom setting, although it appears that the trial court was attempting to gauge [White's] mental stability and chose a level of conversation appropriate for a twelve-year-old in order to do so.... However, in doing so the trial court managed to share personal information about itself and its family. Worse yet, the trial court told [White] that it would attempt to get her pizza while she was incarcerated, which would certainly constitute special treatment as I doubt that the trial court often attempted to obtain pizza for other alleged murderers who await trial. Whether or not the trial court's conduct during the 12/02/99 status hearing amounts to an appearance of impropriety is a very close question.

*White,* at 565 (Joyce, J., dissenting). The dissent went on to examine the judge's statements that she could not be "forced to treat this like a normal case"; the dissent pointed out that, contrary to the judge's statements, "the law does provide for this type of situation." *Id.* Citing 42 Pa.C.S. §§ 6322, 6355(e), Judge Joyce noted:

> Contrary to the trial court's belief that "this system is not equipped to deal with this case" the legislature has already made a determination as to how this type of case is to be handled. The trial court's pronouncement that it was not going to be "boxed into treating this like a normal case" unless it was "ordered to by higher-ups" indicates that the

trial court pre-judged the case and [was] unwilling to follow the law as set forth by the legislature, and as it was required to do.

*Id.*, at 567.

We agree; although the judge stated that she would be able to apply the law, her oft-voiced opinion was about the shortcomings of the legal system in this type of case and her refusal to treat the case "normally," short of "an order from [then Chief Justice] Flaherty." Such public denouncement of the very system in which an impartial jurist is one of the key components creates the appearance of impropriety. Telling the accused that she was going to work hard to do things for her was inappropriate for an impartial jurist. Had the judge offered to work hard for the prosecution, White would certainly have grounds for recusal—showing partiality is not excused merely because the parties are reversed.

 Personal opinions concerning the adequacy or propriety of the law pertaining to a given situation have no place on the trial bench. While the underlying facts concerning White's background are indeed tragic, the law provides the procedure to be followed in White's case. As the judge who presided at the decertification hearing noted: "I cannot exonerate Mariam just because I feel sorry for her. I cannot return Mariam to juvenile court just because her life story and her life circumstances make my heart weep. I can't do it. My oath as a judge requires that I decide this case on the basis of the facts that I heard in court, and that's what I have done." N.T. Decertification Hearing, 11/2/00, at 38. Judge Hughes's comments created an appearance of impropriety which added to the already questionable conversation she engaged in with White.

Finally, the judge's reaction to the Commonwealth's recusal request cements the conclusion that recusal is appropriate in this case because of the appearance of impropriety. As the dissent noted:

The vehement reaction of the trial court to a motion that is reasonably meritorious is the proverbial final nail in the

coffin.... While the examples I have reviewed, standing alone, may not warrant the conclusion that there existed an appearance of impropriety, I would find that in the aggregate, such a determination is compelling. While I can appreciate the efforts of the trial court in attempting to reach a resolution favorable to all the parties involved, in doing so the overall effect was to create an appearance of impropriety.

*White*, at 568 (Joyce, J., dissenting).

Mindful of the high standard to which a trial judge is held, and of the ready availability of another trial jurist, we conclude the judge should have recused herself in this matter.

### III. Commonwealth's Right to Appeal Denial of Request for Jury at Degree of Guilt Hearing Under Pa.R.A.P. 311(d)

The second question is whether the Commonwealth is entitled to demand a jury at a degree of guilt hearing when a defendant pleads guilty to murder generally. Before addressing the merits of this issue, we must determine whether we have jurisdiction over the issue, since it also comes before this Court under Rule 311(d).

The Superior Court concluded it had jurisdiction over this question under Rule 311(d), relying on *Commonwealth v. Johnson*, 542 Pa. 568, 669 A.2d 315 (1995). *See id.* (assuming jurisdiction over interlocutory order transferring case from criminal to juvenile division). The court was persuaded that if jurisdiction were not present, this constitutional issue might never reach the appellate courts; in the event of an acquittal, the Commonwealth would have no right to appeal because it is precluded from challenging a not guilty verdict. *White*, at 561 n. 6. Similarly, in the event of a conviction, the Commonwealth would have no right of appeal since it was not an aggrieved party. *Id.*

The Commonwealth certified that the denial of its request for a jury at the degree of guilt hearing would substantially handicap its case; this issue is intertwined with the recusal issue, as the Commonwealth is asserting it will be forced to

proceed before a judicial fact-finder who is biased against it. There are two potential protections either party in a criminal proceeding may have in a circumstance where there is concern the presiding judge will be unfair or biased: a recusal request or a jury demand. Here, the Commonwealth was denied both, and, as the trial court inexplicably refused to certify the question for interlocutory appeal under 42 Pa.C.S. § 702(b), sought review under the only avenue available to it: Rule 311(d). Having complied with the requirements of that Rule by certifying in good faith that denial of a jury will hamper the presentation of its case, the Commonwealth is entitled to review under Rule 311(d), and we proceed to the merits of the jury trial issue.

## IV. Commonwealth's Right to Jury at Degree of Guilt Hearing

White argues Pa.R.Crim.P. 803(A) and 590(C)[6] are clear: when a defendant pleads guilty to murder generally, only the trial judge has the authority to determine the degree of guilt. A guilty plea to murder generally is simply a guilty plea, she avers, and there is no right to a jury for a guilty plea; case law from this Court establishes a degree of guilt hearing is not a trial. White's Brief, at 50–51 (citing *Commonwealth v. Petrillo*, 340 Pa. 33, 16 A.2d 50 (1940); *Commonwealth v. Staush*, 256 Pa. 620, 101 A. 72 (1917)). Additionally, White asserts a defendant has no right to a jury at a degree of guilt hearing, and the Pennsylvania Constitution only gives the Commonwealth the same right to a jury as a defendant has. Consequently, the Commonwealth cannot have a right to a jury at a degree of guilt hearing.

**6.** These Rules provide:
> When a defendant charged with murder enters a plea of guilty to a charge of murder generally, the judge before whom the plea is entered shall alone determine the degree of guilt.

Pa.R.Crim.P. 803(A).
> In cases in which the imposition of a sentence of death is not authorized, when a defendant enters a plea of guilty or *nolo contende-re* to a charge of murder generally, the judge before whom the plea was entered shall alone determine the degree of guilt.

*Id.*, 590(C).

White also rejects the Commonwealth's reliance on *Apprendi v. New Jersey,* 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), *Ring v. Arizona,* 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), and *Blakely v. Washington,* 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004), for the proposition that a jury is required at a degree of guilt hearing. According to White, those cases merely demonstrate the Sixth Amendment bars a judge from imposing a sentence beyond the prescribed statutory maximum without having a jury determine the predicate facts for such a finding. Here, however, there is no sentencing issue, since there is nothing to suggest the judge might impose a sentence different from that provided by statute or engage in additional fact-finding during sentencing. Accordingly, White concludes that any reliance on those cases is inapt.[7]

The Commonwealth responds that in *Apprendi, Ring,* and *Blakely,* the United States Supreme Court declared a defendant has a Sixth Amendment right to have a jury decide any factual questions that can trigger an increased maximum sentence. Therefore, those cases require a jury determination of an essential element of a crime, *i.e.,* mental state, which would be the issue at the degree of guilt hearing. Accordingly, a defendant has the right to have a jury make those determinations, and under Article I, § 6, the Commonwealth must have that same right.

Alternatively, the Commonwealth points out that in order to plead guilty generally and proceed to a degree of guilt hearing, a defendant must waive the right to a jury trial. Thus, under Article I, § 6, if the defendant has the right, as she does if it must be waived, then the Commonwealth also has the right to a jury. The Commonwealth points out that Pa. R.Crim.P. 620[8] demonstrates both the defendant and the

---

**7.** White also argues, for the first time, that the jury trial ballot question violated the "separate vote" requirement of Article 11, § 1 of the Pennsylvania Constitution. Pa. Const. art. XI, § 1. This issue is raised for the first time before this Court and as such, it is waived. Pa.R.A.P. 302(b).

**8.** The Rule provides, in pertinent part: "In all cases, the defendant and the attorney for the Commonwealth may waive a jury trial with approv-

Commonwealth must waive a jury trial "in all cases." *Id.* The Commonwealth argues that since it never waived such right, it was entitled to a jury at the degree of guilt hearing under Article I, § 6 of the Pennsylvania Constitution.

## A. Analysis

Article I, § 6 was amended in 1998, to give the Commonwealth the same right to a jury trial as a defendant, and provides:

> Trial by jury shall be as heretofore, and the right thereof remain inviolate. The General Assembly may provide, however, by law, that a verdict may be rendered by not less than five-sixths of the jury in any civil case. Furthermore, in criminal cases the Commonwealth shall have the same right to trial by jury as does the accused.

Pa. Const. art. I, § 6. As the Commonwealth is expressly afforded "the same right" that a defendant has, we must determine whether a defendant has the right to a jury at a degree of guilt hearing. If so, then the Commonwealth has the identical right.

Traditionally, our jurisprudence has held a degree of guilt hearing is not a trial. *Petrillo*, at 56. However, as the Superior Court noted in the present case:

> A plea of guilty to murder generally is a unique plea, unlike anything else provided in statute or decisional law.... In a guilty plea, no evidence is presented against the defendant.... A Rule 590(c) proceeding, on the other hand still requires the presentation of evidence, the arguments of counsel and the finding of facts in support of a verdict.

* * *

This option, created by rule and available only to murder defendants, is not a simple guilty plea. It is instead a variation of a waiver trial....

al by a judge of the court in which the case is pending, and elect to have the judge try the case without a jury."
Pa.R.Crim.P. 620.

*White*, at 562. This characterization is generally correct; a defendant's plea of guilty to murder generally bifurcates the fact-finding process which ordinarily occurs at trial—it dispenses with the need to determine whether the defendant committed murder, but leaves open for determination the question of the degree. A plea of guilty to murder generally "is simply an acknowledgement by a defendant that he participated in certain acts with a criminal intent." *Commonwealth v. Mitchell*, 528 Pa. 546, 599 A.2d 624, 626 (1991) (citing *Commonwealth v. Anthony*, 504 Pa. 551, 475 A.2d 1303 (1984)). The purpose of the degree of guilt hearing is "to determine whether the homicide was murder of the first, second or third degree, or voluntary manslaughter." *Commonwealth v. Myers*, 481 Pa. 217, 392 A.2d 685, 687 (1978). Thus, although the defendant has pled guilty to murder generally, an essential question remains: the defendant's state of mind at the time of the killing.

Recently, the United States Supreme Court has expanded a criminal defendant's right to have a jury, rather than a judge, make factual determinations which subject a defendant to an increased penalty. In *Apprendi*, *supra*, the Court held any factual determination increasing the penalty for a crime beyond the statutory maximum must be submitted to a jury. *Id.*, at 490, 120 S.Ct. 2348. In *Ring*, *supra*, the Court held the determination of the existence of aggravating factors in a death penalty case must be made by a jury. *Id.*, at 588, 122 S.Ct. 2428. Finally, in *Blakely*, *supra*, the Court held state sentencing guidelines were unconstitutional where they permitted a judge to sentence a defendant outside the guidelines, upon the judge's finding of additional facts such as deliberate cruelty. *Id.*, at 303–04, 124 S.Ct. 2531.

 Here, as in *Apprendi*, *Ring*, and *Blakely*,[9] factual determinations that affect the maximum penalty will be made

9. While these cases were decided under the Sixth and Fourteenth Amendments of the federal constitution, if a defendant has this right under the federal constitution, then the right also exists under the Pennsylvania Constitution. *See Commonwealth v. Aponte*, 579 Pa. 246, 855 A.2d 800, 806–07 (2004) (in interpreting provision of Pennsylvania Constitution, Court is not bound by United States Supreme Court

at the degree of guilt hearing. A plea to murder generally raises a presumption of malice, an essential element of third degree murder; the defendant may rebut the presumption of malice by introducing evidence negating this element, thereby reducing the degree of guilt to voluntary manslaughter. *See Commonwealth v. Shaver,* 501 Pa. 167, 460 A.2d 742, 743 (1983); *Commonwealth v. Geiger,* 475 Pa. 249, 380 A.2d 338, 340 (1977); *Commonwealth ex rel. Kerekes v. Maroney,* 423 Pa. 337, 223 A.2d 699, 701 (1966) (noting that, to extent defendant may be found guilty of manslaughter after pleading guilty to murder generally, "the burden is upon him to adduce evidence which will so mitigate the offense"). If the element of malice is disproven by White, she will be guilty of voluntary manslaughter, which carries a maximum penalty of 20 years imprisonment. 18 Pa.C.S. § 2503(c); *id.,* § 1103(1). If malice is not negated, White will be guilty of third degree murder, which carries a maximum penalty of 40 years imprisonment. *Id.,* § 1102(d).[10] Although the court does not have the authority to sentence White beyond the statutory maximum for either degree of homicide, White will still face the possibility of receiving twice the sentence for manslaughter if third degree murder is proven. As the *Blakely* Court noted, "the 'statutory maximum' for *Apprendi* purposes is the maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant." Blakely,* at 303, 124 S.Ct. 2531 (citing *Ring,* at 602, 122 S.Ct. 2428; emphasis in original). Therefore, the maximum sentence White may receive is dependent on the findings made at the hearing.

decisions interpreting similar, yet distinct, federal constitutional provisions; however, federal constitution establishes certain minimum levels which are "equally applicable to the [analogous] state constitutional provision.") (quoting *Commonwealth v. Edmunds,* 526 Pa. 374, 586 A.2d 887, 894 (1991) (citations omitted)). If a defendant has such right under the Pennsylvania Constitution, then so does the Commonwealth. Pa. Const. art. I, § 6.

10. First degree murder is not at issue, as the Commonwealth limited the charges to third degree murder and possession of an instrument of crime. *See* N.T. Status Hearing, 11/17/00, at 6.

666

## B. Conclusion

By pleading guilty to murder generally, however, White waived her right to have a jury as fact-finder in her case. *See* Pa.R.Crim.P. 590(c); *id.,* 803(A); *Commonwealth v. White,* 818 A.2d 555, 562 (Pa.Super.2003); *see also Commonwealth v. Passmore,* 857 A.2d 697, 710 (Pa.Super.2004). *See generally Florida v. Nixon,* 543 U.S. 175, 187, 125 S.Ct. 551, 160 L.Ed.2d 565 (2004) ("By entering a guilty plea, a defendant waives constitutional rights that inhere in a criminal trial, including the right to a trial by jury[.]"). Waiving one's right, however, does not constitute waiver of another's corresponding right; White cannot vitiate the Commonwealth's right by waving her own. Accordingly, we conclude the Commonwealth retains its right to a jury under Article I, § 6 of the Pennsylvania Constitution, Pa. Const. art. I, § 6 ("in criminal cases the Commonwealth shall have the same right to trial by jury as does the accused."); *see also Commonwealth v. Tharp,* 562 Pa. 231, 754 A.2d 1251 (2000) (holding amendment to Article I, § 6, which affords Commonwealth same right to jury trial as accused, is constitutional), and it may request one at the degree of guilt hearing.

## V. Disposition

Accordingly, we reverse the quashal of the Commonwealth's appeal from the denial of its recusal motion and remand for the appointment of another judge in this matter. We affirm the order reversing the denial of the Commonwealth's request for a jury at White's degree of guilt hearing.

Order reversed in part and affirmed in part. Case remanded. Jurisdiction relinquished.

Justice EAKIN delivers the Opinion of the Court with respect to parts II, III and IV.B, in which Justice CASTILLE, Justice NEWMAN and Justice SAYLOR join, and a plurality opinion with respect to parts I and IV.A, in which Justice CASTILLE and Justice NEWMAN join.

Former Justice NIGRO did not participate in the decision of this case.

Justice SAYLOR files a concurring and dissenting opinion.

Chief Justice CAPPY files a dissenting opinion in which Justice BAER joins.

Justice SAYLOR, concurring and dissenting.

I join Parts II, III, and IV.B of the majority opinion, but I respectfully dissent relative to the affordance of as-of-right appellate review of a trial judge's decision on a Commonwealth motion to recuse. My reasoning follows.

As concerns the Commonwealth's ability to appeal as of right under Rule of Appellate Procedure 311(d) from a trial court's order denying a recusal request (Part I of the majority opinion), I would affirm the decision of the Superior Court majority based largely on the reasoning that it supplied. *See Commonwealth v. White*, 818 A.2d 555, 557–58 (Pa.Super.2003). Consistent with this Court's recent decision in *Commonwealth v. Shearer*, 584 Pa. 134, 882 A.2d 462 (2005), the Superior Court recognized that, although Rule 311(d) extends outside the suppression context and some deference should be accorded to the Commonwealth's good-faith certification, some subject-matter limitations on Rule 311(d)'s scope are appropriate, based on the interest in containing the exception's impingement on the general principle that interlocutory orders are not appealable as of right. *See White*, 818 A.2d at 559.[1] In my view, this reasoning is consistent with *Commonwealth v. Cosnek*, 575 Pa. 411, 836 A.2d 871 (2003), as clarified in *Shearer*, 584 Pa. at 141 & n. 6, 882 A.2d at 466–67 & n. 6, and I would not overrule *Cosnek* in any respect. *Accord id.* at 150–51, 882 A.2d at 472–73 (Saylor, J., concurring) (expressing an understanding of Rule 311(d) similar to that of the Superior Court majority in the present case).

---

1. My only significant difference with the Superior Court majority's reasoning is its approving reference to the decision on the merits in *Commonwealth v. Shearer*, 828 A.2d 383 (Pa.Super.2003), which was recently reversed by this Court. *See Shearer*, 584 Pa. at 147, 882 A.2d at 470.

Notably, here the Commonwealth also sought certification of the recusal issue for interlocutory appeal under Appellate Rules 312 and 1311, *see also* 42 Pa.C.S. § 702(b), and then filed a Rule 1511 petition for review with the Superior Court when that request was denied. *See White,* 818 A.2d at 557 n. 1; Pa.R.A.P. 1511. I find this to be the preferable avenue for obtaining review of an order denying recusal, as it permits the appellate court to determine whether it is likely that a sufficient showing of actual or apparent judicial bias appears as of record as a prerequisite to the allowance of an appeal in this setting. Indeed, had the Commonwealth filed an appeal in this Court relative to the Superior Court's decision to deny its petition for review, I would have been inclined to reverse. In this regard, I would apply the majority's reasoning in Part II of its opinion that Judge Hughes' interactions with Appellee, although they appear to have been well intentioned, raise the potential appearance of impropriety.[2]

On the question of whether Rule 311(d) applies with regard to the Commonwealth's challenge to the trial court's decision to deny its request for a jury trial at the degree-of-guilt hearing, initially, I join the majority's holding, in Part III of its opinion, that the appeal was available as of right under the

---

**2.** It bears mention that Judge Hughes was not alone in her expressions of concern for Appellee and in her efforts to secure the most appropriate disposition. For example, in ruling on the defense request for decertification, a different judge expressed frustration at the defense's rejection of a treatment-oriented settlement proposal that had been advanced by the Commonwealth and indicated as follows:

> This Court expended great effort in trying to secure treatment for Miriam. I did this, in part, out of recognition of the importance to the community that Miriam receive treatment. I made special efforts because .... my sense of social responsibility dictates to me that we try to help Miriam.
>
> * * *
>
> I know Miriam is tortured by many demons. I really want to help her.
>
> * * *
>
> Miriam White ... is a sad, damaged, disturbed child who needed our help before she hurt somebody else.

N.T., Nov. 2, 2000, at 21–22, 35, 37. The record, however, reflects a qualitative difference between the two judges' treatment of the respective positions of the Commonwealth and the defense, as reflected in the majority opinion.

rule. In this regard, it seems reasonably clear to me that the trial court's refusal of its request for a jury trial substantially handicapped the prosecution, as such decision facially impinged on a constitutional right afforded to the Commonwealth. *See* PA. CONST. art I, § 6.

On the merits, however, I have difficulty with the premise that a degree-of-guilt hearing is appropriate to this case at all, since the Commonwealth, in light of Appellee's age and mental condition, limited the charges against her to third-degree murder and possession of an instrument of crime. *See* N.T., November 17, 2000, at 6. Rule of Criminal Procedure 590(C), however, provides for a degree-of-guilt hearing when the defendant enters a plea of guilty or *nolo contenedre* to a *charge* of murder generally. *See* Pa.R.Crim.P. 590(C). Here, as noted, there is no longer any such charge pending before the court. Thus, in my view, in the absence of another compromise agreed to by the Commonwealth, Appellee's choice was to plead guilty to the extant charge of third-degree murder or to stand trial.

I agree with the majority's conclusion, however, in Part IV.B of its opinion, that a plea to murder generally encompasses an affirmative waiver, by the defendant, of her right to have a jury determine her degree of guilt, as explained below. The salient point is that, in light of the amendment to Article I, Section 6, a defendant cannot, by means of such waiver, vitiate the corresponding jury-trial right possessed by the Commonwealth.

When a criminal defendant is initially hailed into court, the status quo is that she cannot alone obviate a jury proceeding while maintaining defenses to the charges. The manifest intent to place the Commonwealth on equal footing with a criminal defendant in this respect is made abundantly clear by the plain English statement that accompanied the ballot question proposing the amendment. This statement explains, in significant detail, that the motivation underlying the amendment was the desire to curtail this Court's ability to utilize its procedural rulemaking powers to thwart such equalization.

In line with the approach of the Superior Court, I believe that the analysis of this issue should be grounded on the understanding that the assignment by Rules 590(C) (Pleas and Plea Agreements/Murder Cases), and 803(A) (Guilty Plea Procedure), of the fact-finding function to a judge, as opposed to a jury, depends integrally upon the defendant's waiver, associated with her invocation of those rules, of her right to a jury trial. *See Commonwealth v. White,* 818 A.2d 555, 562 (Pa.Super.2003); *see also Commonwealth v. Passmore,* 857 A.2d 697, 710 (Pa.Super.2004). *See generally Florida v. Nixon,* 543 U.S. 175, 187, 125 S.Ct. 551, 560, 160 L.Ed.2d 565 (2004) ("By entering a guilty plea, a defendant waives constitutional rights that inhere in a criminal trial, including the right to a trial by jury[.]").

As to the analysis in Part IV.A of the majority opinion, I do agree that, in the wake of the United States Supreme Court decisions in *Apprendi v. New Jersey,* 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), and *Blakely v. Washington,* 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004), it is now manifest that, in the absence of such waiver, a defendant would maintain the right to a jury trial in a degree-of-guilt proceeding. However, I would not proceed under *Apprendi* by reference to the possibility of a manslaughter verdict. The reason is that a plea to murder generally, and the associated waiver, raise a presumption of guilt of third-degree murder, *thus encompassing a presumption of malice. See Commonwealth v. Shaver,* 501 Pa. 167, 169, 460 A.2d 742, 743 (Pa.1983); *Commonwealth v. Geiger,* 475 Pa. 249, 254, 380 A.2d 338, 340 (1977); *Commonwealth ex rel. Kerekes v. Maroney,* 423 Pa. 337, 340, 223 A.2d 699, 701 (1966) (noting that, to the extent the defendant may be found guilty of manslaughter after pleading to murder generally, "the burden is upon him to adduce evidence which will so mitigate the offense"). By contrast, the *Apprendi* rule pertains to facts of which the defendant is presumed innocent, and which the prosecution must prove to a jury beyond a reasonable doubt.

It is more relevant that, to obtain a second- or first-degree murder conviction at an ordinary degree-of-guilt hearing, the

Commonwealth must prove facts that elevate the offense to that level. *See Maroney*, 423 Pa. at 340, 223 A.2d at 701; *Commonwealth ex rel. Dandy v. Banmiller*, 397 Pa. 312, 315, 155 A.2d 197, 199 (1959). Significantly, in this regard, the penalties for first-degree murder (life imprisonment or death, *see* 18 Pa.C.S. § 1102(a)), and second-degree murder (life imprisonment, *see* 18 Pa.C.S. § 1102(b)), exceed the maximum penalty for third-degree murder (40 years' imprisonment, *see* 18 Pa.C.S. § 1102(d)). Therefore, any sentence for first- or second-degree murder exceeds the maximum sentence otherwise imposable solely on the basis of the general plea to murder. This, in turn, means that, *absent an express waiver*, a defendant who pleads guilty to murder generally has a federally-guaranteed right under the Sixth and Fourteenth Amendments—as interpreted in *Apprendi* and its progeny—to have a jury decide her degree of guilt. *See generally Blakely*, 542 U.S. at 313–14, 124 S.Ct. at 2543 (after pleading guilty, the defendant retained the right to have a jury find any fact that would elevate his sentence above the otherwise-imposable statutory maximum); *Apprendi*, 530 U.S. at 490, 120 S.Ct. at 2362–63 ("Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt.").

Notably, as well, although *Apprendi*, *Blakely*, and *Ring v. Arizona*, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002) (invalidating a procedure whereby a sentencing judge, sitting without a jury, finds an aggravating factor necessary for imposition of the death penalty), all pertained to sentencing proceedings, the holdings in those cases derived from the Sixth Amendment's guarantee of a *trial* by jury. It is thus evident that the United States Supreme Court views the term "trial" in the Sixth Amendment as encompassing a broad set of criminal proceedings in which fact finding occurs, particularly where the facts found may result in criminal punishment exceeding that which would otherwise be imposable. Given this broad view of the term "trial" under the Sixth Amendment, and that the 1998 amendment to Article I, Section 6

expressly equates the Commonwealth's rights in this setting with those of the defendant, it is appropriate not to apply an unduly narrow definition of the word "trial" to defeat the Commonwealth's jury rights as to degree-of-guilt hearings. In this light, Appellee's suggestion that *Apprendi, Ring,* and *Blakely,* having been decided relative to sentencing proceedings, lack relevance in the present, guilt-determining context, is perverse.

Rules 590(C) and 803(A) should obviously be amended in light of the amendment to Article I, Section 6—they were written at a time when the Commonwealth did not possess a right to a jury trial and have been grounded in explanations that are in tension with now-prevailing constitutional law. Thus, Appellee's attempt to carry them over in their present form into the post-amendment context is inconsistent with the intent of the revised Constitution and is not supportable. Pending necessary amendments to the rules, I can only envision that a defendant should be afforded their full benefit upon the Commonwealth's consent and waiver of its own jury trial right. Additionally, I note that a defendant has other means of accomplishing some of the effects of Rules 590(C) and 803(A); for example, she may stipulate to facts at trial, such as her involvement in the killing, thus perhaps taking some of the sting out of the Commonwealth's case and enhancing her credibility before the fact finder on the question of her degree of guilt. What she may not do, however, is retain a benefit of these rules (which may be one of the most significant ones) that has been expressly obviated by a constitutional amendment.

Chief Justice CAPPY dissenting.

I dissent.

Today, in short order, the majority ignores the principle of *stare decisis* by overruling a three-year-old decision of this court, eviscerates the final order rule, erroneously reverses a trial judge's determination that she can be a fair and impartial jurist, and undermines a defendant's right to plead guilty to

murder. For these reasons, I can join no part of the majority opinion.

In *Commonwealth v. Cosnek*, 575 Pa. 411, 836 A.2d 871 (2003), this court construed Rule 311(d) regarding interlocutory appeals of right. In that case, we explained that the "plain language" of the rule limits its application to the "circumstances provided by law." Thus, in that case, we undertook an examination of what the phrase, "circumstances provided by law," meant. We conducted a lengthy analysis of the "legal underpinnings" of the Rule, explaining that the language of the Rule was derived from *Commonwealth v. Bosurgi*, 411 Pa. 56, 190 A.2d 304 (1963), in which this court devised a strategy for evaluating cases after *Mapp v. Ohio*, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961). In *Mapp*, the United States Supreme Court concluded that evidence seized in violation of the Fourth Amendment was inadmissible in state proceedings.[1] Thus, *Bosurgi* held that when a pretrial order of suppression will terminate or handicap the prosecution, the order has an "attribute of finality" so as to give the Commonwealth the right of immediate appeal. In *Cosnek*, we further explained that subsequent case law clarified *Bosurgi*, such that the Commonwealth merely needed to allege that an order suppressing, precluding, or excluding Commonwealth evidence terminated or substantially handicapped its case in order for a pretrial appeal under Rule 311(d). *Cosnek*, 836 A.2d at 874 (citing *Commonwealth v. Dugger*, 506 Pa. 537, 486 A.2d 382, 386 (1985)). Ultimately, we set forth a clear understanding of what the phrase "circumstances provided by law" signified, concluding that the application of the rule should be limited "to those 'circumstances provided by law' in which a pretrial ruling results in the suppression, preclusion or exclusion of Commonwealth evidence." *Cosnek*, 836 A.2d at 877. Simply stated, in *Cosnek*, we held that Rule 311(d) applied only in those instances in which evidentiary rulings made by

1. "In the wake of *Mapp* new impetus has been given to the practice of filing by defendants of motions to suppress evidence seized in allegedly illegal searches. In this Commonwealth, such motions, save in exceptional circumstances, are *now required* to be made *in advance of trial*." *Bosurgi*, 190 A.2d at 308 (emphasis in the original).

the trial court substantially interfered with the presentation of the Commonwealth's case.

In the instant case, the majority first attempts to distance itself from the holding in *Cosnek* by explaining that the decision was limited to the narrow facts before it. Such an assertion is unconvincing, since the proper construction of Rule 311(d) was hotly debated at the time of *Cosnek*. Indeed, the majority's position today was one that was advocated in a dissent at the time of *Cosnek*, but plainly rejected in favor of a different standard. Yet, the same standard that was rejected a mere three years ago is resurrected and offered by the court as a majority viewpoint. Ultimately, even the majority recognizes that it may not be enough to simply "limit" our holding in *Cosnek* to the facts of that case, and overrules it to the extent it may be understood differently. *See* Majority Opinion at 654–55.

We should not simply overrule case law because the composition of the court has changed and a dissenting Justice can garner a majority of votes. The doctrine of *stare decisis* is not new nor should it be ignored. Rather, as this court stated over 100 years ago,

> [i]t is sometimes said that this adherence to precedent is slavish; that it fetters the mind of the judge, and compels him to decide without reference to principle. But let it be remembered that *stare decisis* is itself a principle of great magnitude and importance. It is absolutely necessary to the formation and permanence of any system of jurisprudence. Without it we may fairly be said to have no law; for law is a fixed and established *rule*, not depending in the slightest degree on the caprice of those who may happen to administer it. I take it that the adjudications of this Court, when they are free from absurdity, not mischievous in practice, and consistent with one another, are the law of the land.

> \* \* \*

> The inferior tribunals follow our decisions, and the people conform to them because they take it for granted that what

> we have said once we will say again. There being no superior power to define the law for us as we define it for others, we ought to be a law unto ourselves. If we are not, we are without a standard altogether. The uncertainty of the law—an uncertainty inseparable from the nature of the science—is a great evil at best, and we would aggravate it terribly if we could be blown about by every wind of doctrine, holding for true to-day what we repudiate as false to-morrow.

*McDowell v. Oyer*, 21 Pa. 417, 423 (Pa.1853) (emphasis in original). The sentiment expressed in *McDowell* remains as potent today as when it was written. There is no question that *stare decisis* requires adherence to recent decisions as precedential authority. *Grimaud v. Commonwealth*, 581 Pa. 398, 865 A.2d 835, 849 n. 2 (2005) (Cappy, J. dissenting). As I explained in my dissenting opinion in *Grimaud*, the purpose of *stare decisis* is to ensure predictability and stability in the affairs of government and people and is essential to the rule of law. *Id.* Moreover, while the doctrine may be disregarded when faced with an unsupportable or erroneous holding, or when over the course of time the reason for a rule of law no longer exists and application would cause injustice, *id.,* the majority fails to explain why the holding in *Cosnek* should cede for any of these reasons.

Indeed, there was good reason for the holding in *Cosnek*, which the majority today fails to address, namely, the final order doctrine. The general rule is that only final orders are appealable as of right. Pa.R.A.P. 341. The policy underlying this rule is "to prevent piecemeal litigation and the consequent protraction of litigation." *Adcox v. Pennsylvania Mfrs. Ass'n Cas. Ins. Co.*, 419 Pa. 170, 213 A.2d 366, 368 (1965). In keeping with this policy, any exceptions to the final order doctrine should be narrowly construed. *See, e.g., Melvin v. Doe*, 575 Pa. 264, 836 A.2d 42, 46–47 (2003). As noted by the majority, Rule 311(d) provides one of those rare exceptions to the final judgment rule. The decision in *Cosnek* properly kept the scope of the exception narrow by focusing on the limited circumstances that the rule was created to protect. In inter-

preting Rule 311(d) to apply in any instance in which an "order terminates or has the practical effect of terminating some or all of the Commonwealth's case . . . and the Commonwealth has certified the same in good faith," the majority ignores that the exceptions to the final order rule must be narrowly construed. Rather, the majority chooses to continue the trend to emasculate the final order doctrine where the Commonwealth seeks to appeal an interlocutory order. *See, e.g., Commonwealth v. Dennis,* 580 Pa. 95, 859 A.2d 1270 (2004).

The troubling posture taken by the majority opinion is compounded by the fact that it not only assumes jurisdiction over an interlocutory matter, but also reverses the trial judge's determination that she could be a fair and impartial jurist. While I believed that the standards for recusal were well settled, the majority's application of those standards in this case brings them into doubt. As the author of the majority opinion set forth in *Commonwealth v. Druce,* 577 Pa. 581, 848 A.2d 104, 108 (2004), this court presumes that judges of the Commonwealth are honorable, fair, and competent. Furthermore, decisions regarding recusal are, in the first instance, to be made by the trial judge as a matter of self-examination to determine whether she can be fair and impartial. "This assessment is a 'personal and unreviewable decision that only the jurist can make.'" *Id.* Following this self-examination, the judge is to determine whether her continued presence on the case "creates an appearance of impropriety and/or would tend to undermine public confidence in the judiciary." *Id.* Appellate review is limited to an abuse of discretion standard and a review of our case law makes clear how very deferential appellate courts are to a trial judge's determination regarding recusal.

In *Druce,* this court was faced with a trial judge who violated Canon 3(a)(6) of the Judicial Code by giving a statement to the press implicating the substantive question at issue in the case before him. This court denied an emergency petition filed by the defendant. Justices Castille and Newman dissented on the basis that the trial judge should remove himself to avoid the appearance of impropriety. Following

this court's denial to exercise King's Bench jurisdiction, the case proceeded to sentencing.

This court reviewed the trial judge's recusal decision on direct appeal and the question before this court was whether a violation of the Judicial Code required recusal automatically. We rejected a *per se* standard in favor of the recusal standard set forth above. Furthermore, we concluded that the trial judge adequately addressed the concerns surrounding his comments to the press prior to sentencing, when he "openly acknowledged making the comments, then reiterated his ability to be fair and impartial. He clearly gave the matter considerable thought, and acknowledged the public interest on both sides of the sentencing issue. We find his introspection and sincere public statements of impartiality sufficient to justify his decision not to recuse himself." *Druce*, 848 A.2d at 111.

Similarly, in *Commonwealth v. Travaglia*, 541 Pa. 108, 661 A.2d 352 (1995), following the trial and first collateral review the trial judge expressed dismay in various statements to the press at the length of time it took to impose the death penalty and stated that "[i]f anyone deserves to die, these two individuals do for killing four people for fun." 661 A.2d at 370 n. 37. Appellant filed a motion seeking to disqualify the judge from reviewing his collateral petition. We reviewed the trial judge's reasoning denying the disqualification motion, finding that his opinion was "thoughtful" and deferred to his determination that public confidence would not be affected by his continuing presence on the case. *Id.* at 370.

What these opinions make clear is that the trial judge's decision regarding recusal is given great deference. Moreover, they evince a trend to give a trial judge the opportunity to reflect on her decision in an opinion or on the record at a time following the initial denial. In this case, the trial judge has not had the opportunity to reflect on her decision and express her reasoning at this early point in the proceedings. This fact is yet another reason why I do not believe an order denying a request for recusal should be immediately appealable.

Nevertheless, I believe there is sufficient evidence on the existing record which supports Judge Hughes' decision. While I agree with the majority that "personal opinions concerning the adequacy or propriety of the law pertaining to a given suggestion have no place on the trial bench," I believe Judge Hughes acknowledged that some of her pretrial comments raised concern and expressed that she could follow the law similar to the trial judges in *Druce* and *Travaglia*. In this regard, the majority gives the trial judge's comments regarding her ability to apply the law short shrift by summarizing them into one-line: "although the trial judge stated that she would be able to apply the law" Majority opinion at 659, 910 A.2d at 658. In reality, however, her comments were far more substantial.

Specifically, during the discussion of the recusal motion, Judge Hughes stated that "I think any fair examination of my record reveals that I absolutely uphold the law in all instances." N.T., 11/17/2000, at 3. She then stated quite forcefully, "I have not prejudged this case. The question is what is the degree that should be assigned to it, and the law is very clear. Either the evidence will make out the elements of first, third or whatever, period. There is nothing about the record before me that says I will do anything other than follow the law." *Id.* at 4. The Commonwealth then asked Judge Hughes whether she could find anything other than third degree murder in this case. She replied that she could not answer the question at this point in the proceedings because she did not know what evidence would be presented and that that question would be for the fact finder. She then explained, "I have read nothing with respect to this case. The Commonwealth will present that evidence as it is required to do. The defense will present whatever it chooses to present, and I will decide. So to have a position that's based on the effort that was made in this very jury room by the four of us to try to have this child evaluated [for mental health] has no bearing on what she is guilty of." *Id.* at 8–9.

The trial judge separately set forth her reasons for denying the recusal motion at a subsequent status hearing. At that

time, Judge Hughes made it evident that pre-trial, her intention was to work with the attorneys to craft a nontrial disposition "that would address the equities and the unique needs of the citizen charged in this case." N.T., 11/20/2000, at 3–4. Recognizing that such a solution did not work, Judge Hughes then stated that she would treat the accused "as an adult." *Id.* at 4. She further explained her pre-trial conduct: "Prior to there being a ruling on decertification I implored these lawyers to do what I deem to be humane, appropriate, and the best interest of our community and the best interest of Mariam [sic] White." *Id.* at 5. Again, she recognized that her efforts were unsuccessful and reiterated that "She will be tried as an adult." *Id.*

Like the trial judges in *Druce* and *Travaglia,* Judge Hughes made clear that she had not prejudged this matter and that she could be a fair and impartial jurist. She acknowledged the comments that she had made, explained that she was only trying to do what was in the best interests of the accused and the community, and then further explicated that those comments related to the pre-trial stage and that nothing that she said or did during that stage would have any impact on the degree of guilt hearing.

Additionally, her statements at these hearings clarified that her pretrial comments and conduct were based on her belief that this case was out of the ordinary, since it involved a thirteen-year-old girl, with the mind of a seven-year-old, on trial for murder. In my opinion, commenting on the extraordinary nature of a case does not amount to an "appearance of impropriety." Nevertheless, even presuming Judge Hughes' comments created the appearance of impropriety, any appearance of impropriety was resolved by her subsequent statements that she would follow the law. Accordingly, even if I believed that a recusal motion was the proper subject of an immediate appeal, I could not join the majority's resolution of the substance of this issue.

Finally, I disagree with the majority's analysis and resolution of the question of whether the Commonwealth has a right

to demand a jury trial for purposes of a degree of guilt hearing. The majority apparently believes that the only way to answer this question is to inquire into whether the defendant would have such a right in these circumstances. Accordingly, in answering this question, the majority turns to federal constitutional law.

This analysis overlooks that the Commonwealth's right to a jury trial is a unique animal under the Pennsylvania Constitution and does not implicate federal constitutional rights. The Pennsylvania Constitution provides that "in criminal cases the Commonwealth shall have the same right to trial by jury as does the accused." PA. CONST. art. I, § 6. By its terms, Article I, Section 6 gives the parties the right to demand a jury if there is a trial.[2] When a defendant pleads guilty to murder generally, however, *there is no trial. Commonwealth v. Petrillo,* 340 Pa. 33, 16 A.2d 50, 56 (1940) ("The proceeding to determine the degree of the crime of murder after a plea of guilty is not a trial."); *see also Commonwealth v. Kirkland,* 413 Pa. 48, 195 A.2d 338, 340 (1963) ("In indictments for murder, defendant, with the consent or approval of his attorney of record, may plead guilty, in which event the crime and the degree of the crime are determined and fixed by a Judge or a Court without a jury."); *cf. Commonwealth v. Staush,* 256 Pa. 620, 101 A. 72 (1917); *accord Hallinger v. Davis,* 146 U.S. 314, 13 S.Ct. 105, 36 L.Ed. 986 (1892) (finding that due process allows a capital defendant to waive the right to jury and proceed before a judge alone for determining the degree of guilt). Indeed, this court has clearly stated on more than one occasion that "determining the degree of guilt is not a trial

---

**2.** My research leads me to the inescapable conclusion that Article I, Section 6 prescribed the right to a mode or method of trial, i.e., a "jury trial." *Accord Byers and Davis v. Commonwealth,* 42 Pa. 89 (1862) (discussing that "mode of trial," i.e., the right to trial by jury "had long been considered the right of every Englishman"); *Singer v. United States,* 380 U.S. 24, 85 S.Ct. 783, 13 L.Ed.2d 630 (1965) (explaining that trial by jury was the one, regular common law mode of trial). Accordingly, I would conclude that Article I, Section 6 gives the parties the right to demand a jury if there is a trial; and in this case, the amendment to Article I, Section 6 gives the Commonwealth the reciprocal right to demand a jury when there is a trial.

though facts from the evidence must be found." *Common-wealth v. Shawell*, 325 Pa. 497, 191 A. 17, 21 (1937); *see Petrillo*, 16 A.2d at 56. There is no ambiguity in Pennsylvania jurisprudence: a degree of guilt hearing is not a trial.

The majority fails to confront this unmistakable and controlling case law in any meaningful fashion, choosing instead to focus its attention on federal constitutional law. *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), *Ring v. Arizona*, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), and *Blakely v. Washington*, 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004). Whether *Apprendi, Ring*, and *Blakely* would guarantee a criminal defendant the right to a jury at a degree of guilt hearing has nothing to do with whether a degree of guilt hearing is a trial. Furthermore, those cases do not compel us to revisit our case law holding that a degree of guilt hearing is not a trial, since they do not define what constitutes a trial. Rather, *Apprendi, Ring* and *Blakely* are concerned with when the right to a jury attaches under the Sixth and Fourteenth Amendments. Those amendments, taken together, entitle a defendant "to a jury determination that he is guilty of every element of the crime with which he is charged, beyond a reasonable doubt." *Apprendi*, 530 U.S. at 477, 120 S.Ct. 2348. The United States Supreme case law has no effect on this court's construction of "trial" under Article 1, § Section 6.

Indeed, it strains credulity to base the Commonwealth's right to a jury trial *under the Pennsylvania Constitution* upon a defendant's right to a jury *under the United States Constitution.* To make our interpretation of the Pennsylvania Constitution dependent upon an analysis of the United States Constitution ignores that our Constitution is a separate and independent document containing distinct rights and remedies. This fact is never truer than in a situation when the right does not even exist under the United States Constitution.

Moreover, utilizing *Apprendi, Ring*, and *Blakely* to give the Commonwealth the right to demand a jury at a degree of guilt hearing turns those decisions on their heads by giving them a meaning that was never contemplated by the United States

Supreme Court. In those cases, the High Court sought to "expand" an accused's right to have a jury at certain criminal proceedings. The majority takes the enhanced right of an accused and perverts it to thwart the accused's right to choose to proceed before a judge. Equating the Commonwealth's rights with the rights of the accused ignores that the Commonwealth can never be in the same position as the accused, since it is impossible for the Commonwealth to be in a position to plead guilty.[3] In fact, the majority's holding will have the practical effect of undermining a defendant's decision to plead guilty in a criminal case and forcing the defendant to a trial.

For these reasons, I respectfully, but emphatically, dissent.

Justice BAER joins this dissenting opinion.

---

3. Contrary to the Majority, I am not convinced that the Sixth Amendment of the United States Constitution plays a role in interpreting Article 1, Section 6 of the Pennsylvania Constitution. Consistent with this court's prior case law, Article 1, Section 6 was simply an attempt to preserve the parties' right to a jury as it existed at common law, and, thus, the amendment would merely give the Commonwealth the same right to a jury as the accused as it existed at common law. Indeed, I believe there is a question whether Article 1, Section 6 is an "analogous" provision to the Sixth Amendment, since the rights given by the Sixth Amendment mirror those contained in Article 1, Section 9 and not Article 1, Section 6. Accordingly, I doubt whether the Sixth Amendment case law is relevant in any fashion to a discussion of Article 1, Section 6.